IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | | |
|---|---|---|
| JEREMIAH A. LEAVY, | ∥ | |
| | ∥ | |
| Petitioner, | ∥ | |
| | ∥ | |
| vs. | ∥ | No. 05-2916-B/V |
| | ∥ | |
| GLEN TURNER, | ∥ | |
| | ∥ | |
| Respondent. | ∥ | |
| | ∥ | |

---

ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

---

Petitioner Jeremiah A. Leavy, Tennessee Department of Corrections prisoner number 288498, an inmate at the Hardeman County Correctional Facility ("HCCF") in Whiteville, Tennessee, filed a petition pursuant to 28 U.S.C. § 2254 on December 5, 2005, along with an application to proceed in forma pauperis. The Court issued an order on December 20, 2005 denying leave to proceed in forma pauperis and directing the petitioner to pay the habeas filing fee within thirty days. Leavy paid the habeas filing fee on January 19, 2006. The Clerk shall record the respondent as HCCF warden Glen Turner.

I.   <u>STATE COURT PROCEDURAL HISTORY</u>

Following a jury trial in the Tipton County Circuit Court, Leavy and a codefendant, Kenneth A. Adams, were convicted on March 17, 1998 of premeditated first degree murder, felony murder, aggravated robbery, and especially aggravated kidnapping. At sentencing, the trial court merged the two murder convictions and imposed a single life sentence with the possibility of parole on Leavy. Leavy was also sentenced to eight (8) years for aggravated robbery and fifteen (15) years for especially aggravated kidnapping, with those sentences to run concurrent with each other but consecutive to the life sentence for murder. The Tennessee Court of Criminal Appeals affirmed. <u>State v. Adams, et al.</u>, No. W1998-00531-CCA-R3-CD, 1999 WL 1565193 (Tenn. Crim. App. Dec. 21, 1999), <u>perm. app. denied</u> (Tenn. July 31, 2000).

Leavy filed a <u>pro se</u> petition pursuant to the then-current version of the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 to -222, in the Tipton County Circuit Court on or about February 26, 2001. Counsel was appointed to represent Leavy and an amended petition was filed. The postconviction court conducted an evidentiary hearing and issued an order denying the petition on or about November 13, 2001. Leavy filed a motion for reconsideration, which was denied. The Tennessee Court of Criminal Appeals affirmed. <u>Leavy v. State</u>, No. W2001-

03031-CCA-R3-PC, 2004 WL 42220 (Tenn. Crim. App. Jan. 8, 2004),
perm. app. denied (Tenn. Dec. 20, 2004).[1]

The Tennessee Court of Criminal Appeals summarized the
facts underlying the criminal charge and the procedural history of
the case as follows:

> On April 27, 1997, at approximately 11:00 a.m.,
> juvenile defendants Adams and Leavy, along with two adult
> co-defendants, entered the 71-year-old victim's home.
> They intended to steal a large amount of money rumored to
> be kept in the house. After fruitlessly ransacking the
> residence, they sat down to watch basketball on
> television and await the victim's return. Sometime
> shortly before 2:00 p.m., the victim returned from
> visiting his convalescent wife in a nursing home.
>
> When the victim entered the kitchen, the four young
> men ambushed him. The adults bound the victim's hands and
> feet with coat hangers and duct tape. Then, he was placed
> in the bathtub, which the perpetrators previously filled
> with water and kerosene. Before leaving, they covered the
> victim with various blankets, drapes, and pieces of
> furniture. The victim died of asphyxia.
>
> The juvenile and adult defendants took twenty
> dollars from the victim's wallet, a microwave oven, and
> a kerosene space heater. They left in the victim's car
> shortly after 2:00 p.m. and spent the afternoon driving
> around eating snacks purchased with the victim's money.
> They abandoned the car in a muddy field after getting
> stuck and hitchhiked back home sometime between 4:00 and
> 4:30 p.m.
>
> Subsequently, both juvenile defendants gave
> statements admitting their involvement in the crimes.
> Authorities took the juveniles into custody on April 28,
> 1997.

State v. Adams, et al., 1999 WL 1565193, at *1.

---

[1]     The petition also asserts that Leavy filed a petition for a writ of
habeas corpus in an unspecified Hardeman County court on an unspecified date, and
that the petition was denied in August, 2005. It is not clear whether that case
is presently on appeal.

II.  PETITIONER'S FEDERAL HABEAS CLAIMS

In this federal habeas petition, Leavy raises the following issues:

1.  Whether he was denied his right to the effective assistance of counsel in violation of the Sixth Amendment;

2.  Whether he was denied due process in the trial court, in violation of the Fourteenth Amendment; and

3.  Whether the transfer of the case from juvenile court constituted double jeopardy.

III.  ANALYSIS

A.  Waiver and Procedural Default

Twenty-eight U.S.C. § 2254(b) states, in pertinent part:

(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

(A)  the applicant has exhausted the remedies available in the courts of the State;  or

(B)  (i)  there is an absence of available State corrective process;  or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2)  An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

Thus, a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254. E.g., Granberry v. Greer, 481 U.S. 129, 133-34 (1987); Rose v. Lundy, 455 U.S. 509,

4

519 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules"). A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure. 28 U.S.C. § 2254(c); <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 477, 489-90 (1973).

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. <u>Picard v. Connor</u>, 404 U.S. 270, 275-76 (1971); <u>Rust v. Zent</u>, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." <u>Gray v. Netherland</u>, 518 U.S. 152, 162-63 (1996). "'[T]he substance of a federal habeas corpus claim must first be presented to the state courts.'" <u>Id.</u> at 163 (quoting <u>Picard</u>, 404 U.S. at 278). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." <u>Id.</u>

Conversely, "[i]t is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." <u>Id.</u> When a petitioner raises different factual issues under the same legal

theory he is required to present each factual claim to the highest state court in order to exhaust his state remedies. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987). He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim. Pillette, 824 F.2d at 497-98. The claims must be presented to the state courts as a matter of federal law. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982); see also Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

Moreover, the state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35 (1991). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87-88 (1977). However, the state-court decision need not explicitly

6

address the federal claims; instead, it is enough that the petitioner's brief squarely presents the issue. <u>Smith v. Digmon</u>, 434 U.S. 332 (1978) (per curiam); <u>see also</u> <u>Baldwin v. Reese</u>, 541 U.S. 27, 30-32 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

When a petitioner's claims have never been actually presented to the state courts but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. <u>Coleman</u>, 501 U.S. at 752-53; <u>Teague v. Lane</u>, 489 U.S. 288, 297-99 (1989); <u>Wainwright v. Sykes</u>, 433 U.S. at 87-88; <u>Rust</u>, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. <u>Teague</u>, 489 U.S. at 297-99; <u>Wainwright v. Sykes</u>, 433 U.S. at 87-88. Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. <u>Coleman</u>, 501 U.S. at 752-53; <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750. The petitioner

must show that "'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995) (quoting <u>Murray</u>, 477 U.S. at 496). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u>

The conduct of Leavy's postconviction proceedings was governed by the then-current version of Tennessee's Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 to -222. That act specified types of procedural default that might bar a state court from reviewing the merits of a constitutional claim. A one-year statute of limitations governed the filing of petitions. <u>Id.</u> at § 40-30-202. The statute also enunciated a standard by which state courts were to determine whether to consider the merits of post-conviction claims:

> Upon receipt of a petition in proper form, or upon receipt of an amended petition, the court shall examine the allegations of fact in the petition. If the facts alleged, taken as true, fail to show that the petitioner is entitled to relief or fail to show that the claims for relief have not been waived or previously determined, the petition shall be dismissed. The order of dismissal shall set forth the court's conclusions of law.

<u>Id.</u> at § 40-30-206(f).[2]

---

[2]     Tenn. Code Ann. § 40-30-206 continued:

(g)   A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(continued...)

The Sixth Circuit has upheld the dismissal of a Tennessee prisoner's habeas petition as barred by a procedural default caused by failing to file within the Tennessee statute of limitations on postconviction relief. Hannah v. Conley, 49 F.3d 1193, 1194-95 (6th Cir. 1995) (construing pre-1995 statute and stating "the language of Tenn. Code Ann. § 40-30-102 is mandatory"). In this case, the prisoner's right to file any further state postconviction petition is barred by the one-year statute of limitations and, therefore, he does not have the option of returning to state court to exhaust any claim presented in this § 2254 petition.

B.   Legal Standard for Merits Review

The standard for reviewing a habeas petitioner's constitutional claims on the merits is enunciated in 28 U.S.C. § 2254(d). That section provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

---

[2]    (...continued)
(1)   The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

(2)   The failure to present the ground was the result of state action in violation of the federal or state constitution.

(h)   A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court. This Court must also decide whether the state court decision with respect to each issue was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

1.    § 2254(d)(1)

The Supreme Court has issued a series of decisions setting forth the standards for applying § 2254(d)(1).[3] In _(Terry Williams v. Taylor_, 529 U.S. 362, 404 (2000), the Supreme Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning. A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in

---

[3]    By contrast, there is a dearth of caselaw concerning the standards for applying § 2254(d)(2).

10

our cases. . . . A state-court decision will also be
contrary to this Court's clearly established precedent if
the state court confronts a set of facts that are
materially indistinguishable from a decision of this
Court and nevertheless arrives at a result different from
our precedent. Accordingly, in either of these two
scenarios, a federal court will be unconstrained by §
2254(d)(1) because the state-court decision falls within
that provision's "contrary to" clause.

Id. at 405-06 (citations omitted); see also Price v. Vincent, 538
U.S. 634, 640 (2003); Lockyer v. Andrade, 538 U.S. 63, 73 (2003);
Bell v. Cone, 535 U.S. 685, 694 (2002).[4] The Supreme Court has
emphasized the narrow scope of the "contrary to" clause, explaining
that "a run-of-the-mill state-court decision applying the correct
legal rule from our cases to the facts of a prisoner's case would
not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."
Williams, 529 U.S. at 406; see also id. at 407 ("If a federal
habeas court can, under the 'contrary to' clause, issue the writ
whenever it concludes that the state court's application of clearly
established federal law was incorrect, the 'unreasonable
application' test becomes a nullity.").

A federal court may grant the writ under the
"unreasonable application" clause "if the state court correctly
identifies the governing legal principle from [the Supreme Court's]
decisions but unreasonably applies it to the facts of the

---

[4]   The Supreme Court has emphasized that this standard "does not require
citation of our cases—indeed, it does not even require awareness of our cases,
so long as neither the reasoning nor the result of the state-court decision
contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (emphasis
in original).

particular case." <u>Cone</u>, 535 U.S. at 694; <u>see also</u> <u>Andrade</u>, 538 U.S. at 75; <u>Williams</u>, 529 U.S. at 409.[5] "[A]n unreasonable application of federal law is different from an incorrect application of federal law." <u>Williams</u>, 529 U.S. at 410.[6] "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409.[7]

---

[5]      Although <u>Williams</u> recognized, <u>in dicta</u>, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," 529 U.S. at 407, the Supreme Court expressed a concern that "the classification does have some problems of precision," <u>id.</u> at 408. The <u>Williams</u> Court concluded that it was not necessary "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)," <u>id.</u> at 408-09, and, to date, the Supreme Court has not had occasion to revisit the issue. <u>See</u> <u>Williams v. Coyle</u>, 260 F.3d 684, 699-700 (6th Cir. 2001), <u>cert. denied</u>, 536 U.S. 947 (2002).

[6]      <u>See also</u> <u>Andrade</u>, 538 U.S. at 75 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d)."); <u>Cone</u>, 535 U.S. at 698-99 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly."); <u>Williams</u>, 529 U.S. at 411 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.").

[7]      <u>See also</u> <u>Brown v. Payton</u>, 125 S. Ct. 1432, 1442 (2005) ("Even were we to assume the '"relevant state-court decision applied clearly established federal law erroneously or incorrectly,"' . . . there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'") (citations omitted).

Moreover, § 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." Harris v. Stovall, 212 F.3d 940, 944 (6th Cir. 2000). As the Sixth Circuit explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1999) (citing 17A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4261.1 (2d ed. Supp. 1998)); see also Harris, 212 F.3d at 944 ("It was error for the district court to rely on authority other than that of the Supreme Court of the United States in its analysis under § 2254(d)."). Finally, in determining whether a rule is "clearly established," a habeas court is entitled to rely on "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

2. § 2254(d)(2)

There is almost no case law about the standards for applying § 2254(d)(2), which permits federal courts to grant writs of habeas corpus where the state court's adjudication of a

13

petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." In a decision applying this standard, the Supreme Court observed that § 2254(d)(2) must be read in conjunction with 28 U.S.C. § 2254(e)(1), which provides that a state court's factual determinations are presumed to be correct unless rebutted by clear and convincing evidence. <u>Miller-El v. Dretke</u>, 125 S. Ct. 2317, 2325 (2005).[8] It appears that the Supreme Court has, in effect, incorporated the standards applicable to the "unreasonable application" prong of § 2254(d)(1). <u>Rice v. Collins</u>, 126 S. Ct. 969, 976 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). That is consistent with the approach taken by the Sixth Circuit, which stated, in an unpublished decision, that

> a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

---

[8]    <u>But cf.</u> <u>Rice v. Collins</u>, 126 S. Ct. 969, 974 (2006) (recognizing that it is unsettled whether there are some factual disputes where § 2254(e)(1) is inapplicable).

<u>Young v. Hofbauer</u>, 52 Fed. Appx. 234, 236 (6th Cir. Dec. 2, 2002) (citing 28 U.S.C. § 2254(e)(1));[9] <u>see also</u> <u>Stanley v. Lazaroff</u>, 01-4340, 2003 WL 22290187, at *9 (6th Cir. Oct. 3, 2003); <u>Jackson v. Holland</u>, No. 01-5720, 2003 WL 22000285, at *7 (6th Cir. Aug. 21, 2003) ("Though the Supreme Court has not yet interpreted the 'unreasonable determination' clause of § 2254(d)(2), based upon the reasoning in <u>Williams</u>, it appears that a court may grant the writ if the state court's decision is based on an objectively unreasonable determination of the facts in light of the evidence presented during the state court proceeding.") (citing <u>Torres v. Prunty</u>, 223 F.3d 1103, 1107-08 (9th Cir. 2000)).

IV.   <u>ANALYSIS OF PETITIONER'S CLAIMS</u>

     A.   <u>Ineffective assistance of counsel (Claim 1)</u>

     In his first claim for relief, Leavy contends that he received ineffective assistance of counsel in violation of the Sixth Amendment. In particular, Leavy complains that counsel failed to arrange for a psychological evaluation after learning that he was mildly mentally retarded. The petition further asserts, vaguely, that defense counsel "released confidential information to the petitioners [sic] co-defendants attorneys which aided the prosecution in their prosecution of the petitioner." Finally, Leavy objects to the fact that his attorney heavily relied on the appellate brief filed by counsel for his codefendant.

---

    [9]   <u>See also</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 546-47 (1981) (applying presumption of correctness to factual determinations of state appellate courts).

The inmate raised a claim of ineffective assistance in his postconviction petition, and the following facts relevant to that claim were set forth in the opinion of the Tennessee Court of Criminal Appeals:

The Petitioner's trial counsel, Frank Deslauriers ("Counsel"), testified that he had represented hundreds of criminal defendants from the time he was licensed to practice law in Tennessee in 1986 through the time of the Petitioner's trial in 1997. Counsel, who was the State's only witness in this post-conviction hearing, stated that he was appointed by the trial court to represent the Petitioner. He stated that he initiated plea bargain proceedings, but the State refused to plea bargain. He explained that he was appointed about three months before the trial and that, during that time, he met with the Petitioner three or four times. Counsel explained that he believed both the period of time and the number of times he met with the Petitioner were adequate to prepare for the trial. He also stated that he felt there was no benefit to requesting a continuance.

Counsel acknowledged that, at the time of the trial, he knew the Petitioner was mildly mentally retarded; however, he stated that the Petitioner appeared to understand the seriousness of the charges and expressed concern about going to jail. Counsel testified that the Petitioner was similar to many of the other defendants he represented and that he believed the Petitioner understood the charges against him and the possible consequences if found guilty.

When asked about the statement the Petitioner gave to the police, Counsel explained that the Petitioner's mother was present for the police questioning. He stated that he spoke with her about her recollection of the questioning, and she told him she did not believe the statement was coerced. Counsel testified that he had no recollection of whether the mother thought the Petitioner did not understand the questions because of his mild mental retardation. Counsel stated that, based on his interactions with the Petitioner and reviewing the statement, Petitioner seemed to understand the questions and was able to answer them "with no problem."

16

Counsel testified that, in preparing for trial, he was able to look at the State's files and to perform discovery. He also stated that prior to the trial he and David Stockton, of the Public Defender's Office, spent a lot of time working on the case. Stockton represented co-defendant Kenneth Adams. Counsel stated that, when he examined the statement given by the co-defendant, the statements were inconsistent.[10] He explained that the statements placed the individuals in the house, "but they all denied they did anything . . . bad to the old man." Counsel explained that the Petitioner's statement was helpful to his defense because it assigned blame to the other individuals and minimized his involvement. When asked why he did not try to suppress the Petitioner's statement, Counsel explained that he initially filed a motion to suppress the statement, but later withdrew the motion for strategic reasons. Counsel stated that he withdrew the motion because he "didn't think it would be successful, and even more importantly, [Counsel] decided the statement [the Petitioner] gave was about as good as [Counsel] could get from him on the witness stand, and [Counsel] didn't want [the prosecutor] to cross-examine [the Petitioner]." Counsel testified that the evidence against the Petitioner was "at least strong" because police found a footprint in the victim's kitchen matching the Petitioner's shoe, and an eyewitness saw the Petitioner and the three co-defendants walking out of a muddy field after abandoning the victim's car.

Counsel explained that he did not have the Petitioner evaluated regarding his mental capacity because the Petitioner had been evaluated two months before the murder. Counsel testified that he spoke with Dr. Lori Keith, who evaluated the Petitioner prior to the murder, as well as informally speaking with an outside doctor. Counsel stated that, when he spoke with the outside doctor, the doctor did not think there was any benefit to having the Petitioner re-evaluated and that there was nothing the doctor could do to help the defense. Counsel recounted that Dr. Keith's diagnosis of the Petitioner was that he suffered from mild mental retardation and oppositional defiant disorder which, to

---

[10]     The Tennessee Court of Criminal Appeals explained in a footnote that "[p]olice arrested four individuals for the murder of the victim. The Petitioner and co-defendant, Kenneth Adams, were tried together. The other two defendants were tried separately. Police took statements from all four defendants." Leavy v. State, 2004 WL 42220, at *3 n.2.

Counsel's understanding, meant the Petitioner was "mean."
Counsel also stated that, in addition to speaking with
these two doctors, he spoke with the Petitioner's
principal and one of his teachers and examined the
Petitioner's school records. He testified that the
Petitioner's school records showed that the Petitioner
was involved in numerous fights. Counsel testified that,
based on these conversations, he did not want any of
these people to testify at the trial because they "didn't
have a whole lot good to say about his ability to fit in,
in any social situation. . . ." Counsel testified that
part of his trial strategy was to tell the jury that the
Petitioner was mildly retarded and to have the Petitioner
tried with his co-defendant, Kenneth Adams. Counsel
explained that he wanted the Petitioner "to be the mildly
retarded defendant next to, hopefully, the really bad
guy, and the jury might cut [the Petitioner] a break
because of that."

Counsel admitted to copying Stockton's appellate
brief "more or less," having reviewed the brief and the
facts of the case. Counsel stated that he felt the brief
raised a good issue, namely a double jeopardy problem,
which was ultimately unsuccessful. He also stated that he
"batt[ed] around a number of [other] issues," including
actual transfer of the Petitioner from juvenile court
because of the mental retardation. Counsel testified that
he determined that there were no other serious issues. He
stated that, after examining the facts, he was determined
that this was a bad case. Counsel explained that "[t]his
was a case in which four young men sat in a house waiting
for a 70-year-old man, tied him up, gagged him, threw him
in the bathtub, piled furniture on him, with water and
kerosene." Counsel testified that he did not think he
could convince a jury that the Petitioner did not
recognize the inherent danger of placing a man wrapped in
a blanked into a bathtub filled with water and kerosene
and then piling furniture on top of him.

Counsel explained that, in hindsight, whenever he
lost a case, he could always find things that he wished
he had done differently, but that it did not mean the
outcome would have changed.

When cross-examined, Counsel was asked about
Stockton's motion to withdraw from representing both the
Petitioner and co-defendant Adams. Counsel stated that
the motion submitted by Co-counsel cited a conflict of

18

interest as the reason for the motion to withdraw from representing both men. Counsel agreed that Stockton had represented the two defendants for approximately four months prior to the motion to withdraw. Counsel stated that during that time, Stockton filed motions to dismiss the indictment on behalf of both Petitioner and co-defendant Adams because they had been held without bond from the time of their arrests on April 28, 1997, until the date of the motions on July 10, 1997, in violation of their Fifth Amendment and due process rights. The trial court denied these motions.

Counsel explained that while reviewing the Petitioner's Covington Middle School records he found five instances of fighting and approximately 30 disciplinary write-ups. When asked if these behavioral problems could have been related to or caused by the Petitioner's mild mental retardation, Counsel stated that he "took that behavior to be part of [the Petitioner's] oppositional defiant disorder, not his mental retardation."

Counsel stated that he withdrew the motion to suppress the statement given by Petitioner on the morning of the trial. Counsel testified that he spoke with Dr. Keith and that she told him the Petitioner read at a second or third grade level. Counsel explained that after he reviewed the Miranda warnings signed by the Petitioner, he believed that the Petitioner understood his rights. Counsel testified that he thought the Petitioner "understood he didn't have to say anything if he didn't want to." Counsel further testified that, while the Petitioner may not have understood certain abstract ideas, "he understood that if he [told] them something . . . it may come back to hurt him."

Counsel also expressed concern that one of the other three defendants might have pled guilty and testified against the Petitioner.

Counsel explained that his main focus in his argument to the jury was to get a negligent homicide conviction rather than felony murder. Counsel conceded that the victim was a very sympathetic individual. Counsel testified that the reason he did not object to the portrayal of the victim as an elderly man who visited his wife at least twice a week in the nursing home was because he was afraid of jury backlash to his objecting

19

to innocuous questions. Counsel explained that if he objected to these questions, he would have been forced to object to every personal question, when much of the information came in during voir dire. Counsel stated that he did not consider filing a motion in limine to prevent the jury from hearing this testimony.

Counsel testified that, while he wanted the jury to think of the Petitioner as mentally retarded, he did not intend to show that the Petitioner did not understand what was going on. Counsel explained that he wanted to show that the Petitioner was a "follower," with the hope that the jury would find him less responsible. Counsel stated that he did not think he could convince a jury that the Petitioner did not know a man could die from being wrapped in a blanket and then buried in furniture in a bathtub full of water and kerosene. Instead, Counsel explained that he was trying to convince a jury that the Petitioner was not trying to kill the victim, rather he wanted to prevent the victim from calling the police. Counsel admitted to introducing evidence at the trial that the Petitioner had an IQ of 66 but failing to explain the significance of that evidence.

. . . .

Counsel stated that he did not remember whether there was any mention of the Petitioner's mental retardation in the appellate brief. He testified that while he used Co-counsel's appellate brief, he did independent research concerning appealable issues and reviewed Co-counsel's brief for accuracy.

The Petitioner produced two witnesses at the hearing, Dr. Ann Phyfer and Co-counsel. Dr. Phyfer testified that she was a psychologist at Timber Springs Adolescent Center with a background in clinical psychology. The parties stipulated that she was an expert. Dr. Phyfer stated that she did not meet with the Petitioner until the night before the post-conviction hearing. She stated that she tested the Petitioner using the Bender Gestalt, a neurological screening test to diagnose organic brain damage, Minnesota Multiphasic Personality Inventory test ("MMPI"), and questions that test abstract thinking. Dr. Phyfer explained that the answers to the questions and some of the Petitioner's questions to her about the various tests led her to conclude that the Petitioner "is a very concrete thinker.

20

He has consistent problems with abstract terms." Dr. Phyfer stated that:

> [The Petitioner] understands hope in concrete terms. He can hope for—hope that he'll have pizza for supper or he can hope that he'll get to play basketball tomorrow, but whether he is hopeful, he has difficulty with. And it was that kind of, that level of abstraction where I would find him having trouble comprehending.

The doctor stated that another example of the Petitioner's trouble with abstract terms was his difficulty in understanding the terms like "social," "drive" when meaning ambition, and "human nature ." "[The Petitioner] understood specific activities, but it's very hard for him to generalize and then recognize the term again in another form. . . ." Dr. Phyfer testified that the Petitioner's results of the Bender Gestalt test indicated that there was no sign of neurological damage. She stated that the Petitioner's visual and motor perception was excellent. Dr. Phyfer explained that the Petitioner had particular difficulty with double negatives.

Dr. Phyfer testified that her "diagnosis by exclusion" of the Petitioner was that he suffered from an adjustment disorder. She explained that the MMPI test did not indicate that the Petitioner was antisocial, under-socialized or aggressive. She stated the Petitioner was someone who was "quite concerned with the impression he is making, with being accepted by his peers." Furthermore, the doctor testified that the Petitioner did not score high on hostility or anger toward anyone, but rather he had "high levels of empathy and understanding." Dr. Phyfer gave the following diagnosis:

> [The Petitioner is] a person who's concerned with being accepted by his peers, who has some doubts about whether other people are going to like him. And those are typical adolescent concerns. He didn't show any pathology [on the tests]. There's no mental illness and no antisocial personality stuff on the tests.

Dr. Phyfer explained that the Petitioner felt sad most of the time. She stated that his sadness came from his remorse and regret at having caused the victim's

death. The doctor testified that the Petitioner thought
about the victim's death "pretty much all the time"
unless he was given an activity to take his mind off the
death. She further testified that the Petitioner had
nightmares and night terrors when asleep and had
flashbacks during the day about the incident.

When asked if the Petitioner was a dangerous
offender, Dr. Phyfer stated that he was dangerous to the
extent that he was led by dangerous people. She explained
that, because he seeks approval from peers, if he fell
under the influence of bad or dangerous people, he may be
susceptible to doing bad things again. However, Dr.
Phyfer testified that the Petitioner was not a danger in
the sense of planning or instigating robberies. Having
examined the Petitioner's school records, the doctor
stated that, although the Petitioner had been in fights,
he had never used weapons, and the idea of harming
another person deliberately "was absolutely foreign to
him." She also stated that the disciplinary problems
indicated his desire to be accepted by his peers by being
the class clown. Dr. Phyfer explained that these
disciplinary problems were the result of his efforts to
make people like him. She also speculated that he might
suffer from an attention deficit disorder but, due to his
depression, it was hard to be certain.

Dr. Phyfer testified that, while the Petitioner
would recognize a knife, gun, or even an instrument that
causes blunt trauma as potentially lethal, he would not
see the blanket or tape as lethal weapons. She stated
that, in his mind, the Petitioner was trying to keep the
victim from moving or calling the police, not trying to
kill him. Dr. Phyfer admitted that she did not have
enough experience or interaction with the Petitioner, but
that, in her opinion, the Petitioner would not see a
connection between covering someone with a blanket and
his death.

Dr. Phyfer testified that the Petitioner would not
understand abstract terms in the Miranda rights waiver
form like "constitutional rights." Furthermore, the
doctor explained that conditional statements like, "If
you do answer questions, your answers can be used as
evidence against you in court," "If you cannot afford to
hire a lawyer," and "If you decide to answer questions
now without a lawyer present, you will still have the
right to stop answering questions at any time until you

talk to a lawyer," were too abstract for the Petitioner to understand. She stated that a conditional statement implies an alternative, which the Petitioner would have been unable to grasp. Dr. Phyfer also explained that the Petitioner would not understand the statement, "You need not answer any question," because of the sentence's structure. Dr. Phyfer stated that "[h]e would understand better, 'You can answer these questions if you want to, but if you don't want to, you don't have to.'" Dr. Phyfer's conclusion was that the Petitioner would not have understood the language or the significance of his rights in a legal context when the police read the Miranda rights to the Petitioner. She stated that, in her opinion, the Petitioner could not have signed the waiver understanding what his rights were and voluntarily waiving them.

On cross-examination, Dr. Phyfer admitted that, other than being mildly retarded, the Petitioner suffered from no mental disease or defect and that he knew the difference between right and wrong. She also admitted that he told her about his participation. She testified that the Petitioner went through the house looking for things to take and that he knew that this behavior was wrong. She further testified that the Petitioner understood that water could cause a person to drown, although she did not believe he understood why he was turning on the water. When shown a photograph of the bathtub and told to assume that under the blanket was a man's head, Dr. Phyfer testified that she believed the Petitioner would see this as "a very, very dangerous thing to do."

Dr. Phyfer explained that, while the school may have diagnosed the Petitioner with an oppositional defiant disorder, it was likely something more severe. She stated that oppositional defiant disorders are usually amenable to behavioral programs which reinforce positive behavior and punish the undesirable behavior. She testified that, in her opinion, the Petitioner suffered from attention deficit hyperactivity disorder or an impulse control disorder.

Dr. Phyfer stated that, while the Petitioner had the physical coordination to tie a knot and to "hog-tie" an individual, he would need directions about how to do it. She explained that the Petitioner "wouldn't be able to think up and carry out that kind of [planned] behavior."

23

When shown a photograph of the victim's hands, Dr. Phyfer testified that she did not think the Petitioner could have bound the hands without someone else modeling the behavior.

On redirect, Dr. Phyfer explained that in general terms, a blanket would not be perceived as lethal if the Petitioner had seen someone wrapped in a blanket with their head covered. She stated that the Petitioner expressed concern about the victim calling the police, and that was why someone put the chest-of-drawers over the bathtub. Dr. Phyfer speculated that:

> [B]y the time he was that far involved in the burglary, I don't think [the Petitioner] was listening to what he called earlier his "best voice," his "best mind," and I don't think he was thinking for himself at all at that point, so that he—the capacity for judgment that he would have ordinarily had would have been diminished even more by being there, with those people telling him what to do and rushing around and engaged in their own goal-directed activity, which was not his goal-directed activity.

Stockton testified that he was appointed to represent both the Petitioner and co-defendant Adams in July of 1997. He testified that, about four months later, he filed a motion to withdraw as counsel for the Petitioner in early November of 1997. Stockton stated that, during that time, he did not spend a great deal of time working with either the Petitioner or co-defendant Adams and he had no recollection of meeting with either of them from July 10, 1997, through November 3, 1997.

Stockton explained he filed the motion to withdraw as counsel for the Petitioner when he received some discovery materials that indicated that the State was seeking to enhance the punishment from life sentences with the possibility of parole to life without parole sentences. He stated that, at the sentencing phase, there would be a discrepancy that could be material with regard to the degree of culpability of the Petitioner and co-defendant Adams. Stockton further testified that he did not perceive there being a conflict of interest because the Petitioner was mildly mentally retarded.

24

Following this evidence, the trial court denied the Petitioner's petition for post-conviction relief. The trial court found that:

> [The] petitioner has failed to establish the factual allegations contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-210. The petitioner has not shown that (a) the services rendered by trial counsel were deficient and (b) the deficient performance was prejudicial. The petitioner has not shown that the services rendered or the advice given was below the range of competence demanded of attorneys in criminal cases. The petitioner has not shown that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.

Leavy v. State, 2004 WL 42220, at *2-*9.

A claim that ineffective assistance of counsel has deprived a habeas petitioner of his Sixth Amendment right to counsel is controlled by the standards enunciated in Strickland v. Washington, 466 U.S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." Id. at 688.

25

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Id. at 689 (citations omitted); see also Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1998) ("The specifics of what Coe claims an effective lawyer would have done for him are too voluminous to detail here. They also largely miss the point: just as (or more) important as what the lawyer missed is what he did not miss. That is, we focus on the adequacy or inadequacy of counsel's actual performance, not counsel's (hindsight) potential for improvement."); Adams v. Jago, 703 F.2d 978, 981 (6th Cir. 1983) ("a defendant 'has not been denied effective assistance by erroneous tactical decisions if, at the time, the decisions would have seemed reasonable to the competent trial attorney'").

A prisoner attacking his conviction bears the burden of establishing that he suffered some prejudice from his attorney's ineffectiveness. See Lewis v. Alexander, 11 F.3d 1349, 1352 (6th Cir. 1993); Isabel v. United States, 980 F.2d 60, 64 (1st Cir.

1992). "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." <u>Strickland</u>, 466 U.S. at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. <u>See</u> <u>id.</u> at 697.

Leavy first asserts that trial counsel was ineffective by

> not demanding a psychological evaluation been [sic] done
> of the petitioner espicially [sic] after learning that
> the petitioner had previously been diagnoised [sic] as
> being mildly retarded due to being in a coma as an
> infant. . . . Tennessee law states that in any 1st degree
> murder case where there is a possibility of the
> defendants [sic] state of mind to come into effect, the
> defendant in question is to be given a complete mental
> evaluation." In this case what screams at this
> ineffective assistance is the fact the public defender
> for the petitioner, due to the petitioner being in a coma
> as an infant and that certain brain damage had been done
> and was well documented. Instead of doing what was right
> and having the petitioner evaluated, the public defender
> actually took it upon himself to actually argue against
> a evaluation stating it would take up time that he didn't
> have to waste. This is unconsionable [sic] that a public
> defender would have no more respect for a defendant that
> this knowing th petitioners [sic] mental background.

As a preliminary matter, petitioner did not raise a claim in his postconviction proceeding that counsel was ineffective for failing to obtain a mental evaluation. Although the factual discussion set forth <u>supra</u> indicates that the state courts may have been presented with the <u>facts</u> necessary to argue such a claim, no explicit claim was made that counsel rendered ineffective assistance, in violation of the Sixth Amendment, by failing to

27

obtain a mental evaluation. Accordingly, that claim is barred by procedural default.[11]

Construing the petition liberally, Leavy arguably exhausted a claim that his counsel was ineffective for failing to obtain a mental evaluation that would have permitted counsel to argue at the sentencing hearing that Leavy's sentences should run concurrently, rather than consecutively, because he was not a dangerous offender. The Tennessee Court of Criminal Appeals rejected that claim on the merits, stating as follows:

> The Petitioner alleges that Counsel was ineffective for failing to demonstrate that his sentences should have run concurrently rather than consecutively. We find this issue to be without merit. At the sentencing hearing, the trial court sentenced the Petitioner to serve his sentences for first-degree murder, felony murder, aggravated robbery and especially aggravated kidnapping consecutively because it found that he was both on probation at the time he committed these crimes and that he was a dangerous offender.
>
> . . . While the State is willing to concede that there was a clerical error and that the Petitioner was not on probation at the time of the incident, the

---

[11]     Moreover, although the Court ordinarily does not address the merits of procedurally defaulted claims, it is noteworthy that the expert who testified on Leavy's behalf at the postconviction hearing concluded that, "other than being mildly retarded, the Petitioner suffered from no mental disease or defect and that he knew the difference between right and wrong." Leavy v. State, 2004 WL 42220, at *8. Thus, the evidence presented by the petitioner does not establish either that he was not competent to stand trial, Drope v. Missouri, 420 U.S. 162, 170 (1975) ("It is long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."); Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam), or that his low intelligence precluded him from possessing the intent necessary for a first degree murder conviction. Counsel made the strategic decision to present Leavy to the jury as retarded without introducing medical testimony about precisely how retarded he was, Leavy v. State, 2004 WL 42220, at *3, as such expert testimony may not have helped Leavy's defense.

Petitioner still must prove that the trial court erred when it found the Petitioner to be a dangerous offender.

Dr. Phyfer testified that the Petitioner was not a dangerous offender in the sense that he was unlikely to plan or instigate robberies. However, Dr. Phyfer testified that the Petitioner was a dangerous offender to the extent that he was led by dangerous people. She explained that, because he seeks approval from peers, if he fell under the influence of bad or dangerous people, he may be susceptible to doing bad things again. She further testified, that after reviewing the Petitioner's school records, she concluded that although the Petitioner had been in fights, he had never used weapons, and the idea of deliberately harming another person "was absolutely foreign to him." She explained that the Petitioner's disciplinary problems were the result of his efforts to make people like him.

Dr. Phyfer testified that the Petitioner told her about his participation in the incident. She stated that he knew the difference between right and wrong, and that, while in his mind he was trying to keep the victim from calling the police and not trying to kill him, the Petitioner would see wrapping someone in a blanket and then placing the person in a bathtub filled with water and kerosene as "a very, very dangerous thing to do."

Dr. Phyfer speculated that, by the time the victim was placed in the bathtub and wrapped in the blanket, the Petitioner was so far involved in the robbery, he was not listening to his "best voice," and, in her opinion, the Petitioner was not thinking for himself at all. She explained that the Petitioner's ordinary capacity for judgment was likely diminished even more by being in the victim's house with other people telling him what to do.

While Dr. Phyfer's testimony was unavailable to the trial court at the time of the sentencing, it is unclear that her testimony would have benefitted the Petitioner's position. Dr. Phyfer stated that the Petitioner, while not an obviously dangerous offender, had the potential to be one if he followed the wrong people. Furthermore, she stated that the Petitioner admitted to being at the home of the victim, participating in the burglary, and understanding the difference between right and wrong. The trial court held that:

29

Petitioner alleges that [Counsel] was ineffective at sentencing by failing to object to consecutive sentencing, and failed to show that defendant was not a dangerous offender.

The state did not pursue life without parole at the trial. Therefore, the only sentence for the murder conviction was life.

[Counsel] went over the pre-sentence report with his client, and stipulated to its admission. Petitioner now claims that there was an error in the report, which stated he was on probation at the time of the offense.

Petitioner received the presumptive sentence of 8 years for aggravated robbery, and the presumptive sentence of 15 years for especially aggravated kidnapping, concurrent, but consecutive to the life sentence.

The Court used two factors under [Tenn. Code Ann. §] 40-35-115 to impose consecutive sentencing. Therefore, even if in error about the factor that the offense was committed while on probation, the consecutive sentencing would still be imposed on the fact that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and who committed a crime in which the risk to human life is high. The Court found that an extended sentence was necessary to protect the public and that consecutive sentences reasonably relate to the severity of the offenses that were committed.

The Court finds that petitioner has failed to satisfy his burden of showing that his counsel was deficient for failing to discover the error in the pre-sentence report, or that his failure to do so prejudiced the outcome of the sentencing. The petitioner is not entitled to post-conviction relief on this issue.

The trial court articulated its finding that the Petitioner was "a dangerous offender whose behavior indicates little or no regard for human life, and who committed a crime in which the risk to human life is high." The testimony by Dr. Phyfer does not contradict

this finding. The Petitioner failed to meet his burden of proving his allegation by clear and convincing evidence. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

State v. Leavy, 2004 WL 42220, at *18-*19.

An analysis of this issue is complicated by the petitioner's failure to refer to the standards for reviewing habeas claims on the merits, see supra pp. 10-15, and to analyze the decision of the Tennessee Court of Criminal Appeals in light of those standards. Leavy has presented no argument that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law, as required by 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, as required by 28 U.S.C. § 2254(d)(2). Accordingly, he has not satisfied his burden of demonstrating that he is entitled to relief on this issue.

Next, Leavy contends that "[t]he public defender also released confidential information to the petitioners [sic] co-defendants [sic] attorneys which aided the prosecution in their prosecution of the petitioner. The public defender actually took a copy of the co-defendants [sic] appeal and made a copy of the appeal and cerimouniously [sic] filed a word for word appeal as the co-defendant all the time ignoring very important issues to be brought up on appeal."

31

If Leavy is presenting a claim that trial counsel rendered ineffective assistance by releasing confidential information about him, that claim was not exhausted in state court and it is procedurally barred.[12]

Leavy's claim that appellate counsel rendered ineffective assistance by copying the appellate brief submitted by his codefendant was exhausted in state court, where the Tennessee Court of Criminal Appeals rejected it on the merits:

> The Petitioner alleges that Counsel provided ineffective assistance of counsel during his appeal. Petitioner bases this allegation on the fact that Counsel copied the co-defendant's brief and, as a result, failed to raise other issues on appeal. The trial court found that:
>
> > It is counsel's responsibility to determine the issues to present on appeal. State v. Matson, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986). This responsibility addresses itself to the professional judgment and sound discretion of appellate counsel. Porterfield v. State, 897 S.W.2d 672, 678 (Tenn. 1995). There is no constitutional requirement that every conceivable issue be raised on appeal. Campbell v. State, 904 S.W.2d 594, 597 (Tenn. 1995). The determination of which issues to raise is a tactical or strategic choice. Id.
> >
> > Petitioner has failed to show how copying the brief of co-counsel was prejudicial. [Counsel]

_____

[12] A single attorney, David Stockton, represented both Leavy and his codefendant but moved to withdraw from the representation of Leavy after receiving information that there might be a difference between the two clients as to their degree of culpability. Leavy v. State, 2004 WL 42220, at *9, *13. Although Leavy exhausted a claim that his counsel rendered ineffective assistance by failing to file a motion to disqualify Stockton, id. at *12-*14, the petition filed in this Court cannot be construed as raising that claim. Stockton testified at the postconviction hearing that, "between July 10, 1997, and November 3, 1997, [the date on which the motion to withdraw was filed,] he spent little time with either the Petitioner or the co-defendant, and that, in fact, he had no recollection of meeting with them during that time and had no notes in his files from that period." id. at *12.

testified that he and [Co-counsel] worked together on the case, and collaborated on the appeal. [Counsel] was satisfied that the main issues were presented on appeal. This was a tactical choice.

The Court finds that petitioner has failed to satisfy his burden of showing that his counsel was deficient for failing to brief additional issues, or that his failure to do so prejudiced the outcome of the appeal. The petitioner is not entitled to post-conviction relief on this issue.

The Petitioner alleges that Counsel merely copied the co-defendant's brief, however, Counsel testified at the post-conviction hearing that that was not the case. Counsel explained that while he copied the brief, he did do research. He explained:

I don't mean I just copied [co-counsel's brief] without reviewing anything and doing the research. That's not correct. I used his hard copy, but I just didn't blindly put things in my brief. I thought that issue on double jeopardy argument was a good issue, because if it was successful [the Petitioner] would walk. But, yes, I did do research.

While the Petitioner alleges that Counsel failed to research issues for appeal, Counsel testified to the contrary at the post-conviction hearing. He testified that he researched possible issues and that he ended up copying the co-defendant's brief after he reached the conclusion that the double jeopardy issue "was really the best appellate issue [the Petitioner] had." We conclude that the Petitioner has failed to show that Counsel's representation at the appellate level was deficient.

Even if Counsel's representation were deficient, however, the Petitioner has failed to show prejudice. To prevail on a claim of ineffective assistance of counsel, the Petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687 . . . . To satisfy the requirement of prejudice, the Petitioner must show a reasonable probability that, had Counsel raised certain issues on appeal, the appellate court would have granted

a new trial or the outcome would have been different. This reasonable probability must be "sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694 . . . . The Petitioner has failed to satisfy this burden. Accordingly, we conclude that the Petitioner is not entitled to post-conviction relief on this issue.

<u>Leavy v. State</u>, 2004 WL 42220, at *20 (citations omitted).

Once again, Leavy has presented no argument that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law, as required by 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, as required by 28 U.S.C. § 2254(d)(2). He has identified no potentially meritorious issues that counsel failed to raise on direct appeal and, consequently, has not even attempted to demonstrate that, if only those issues had been briefed, there is a reasonably probability the outcome of his appeal would have been different. Accordingly, he has not satisfied his burden of demonstrating that he is entitled to relief on this issue.

The first issue is without merit and is DISMISSED.

B.   <u>The alleged denial of due process (Claim 2)</u>

In his second claim for relief, Leavy asserted that he was denied due process in the trial court. He first asserts that the failure of the trial court to ensure that his attorney performed competently constituted a due process violation. The

34

plaintiff did not exhaust this claim in state court, and it is barred by procedural default.

Next, Leavy asserts that his due process rights were violated

> when the [trial] court erroniously [sic] stated in court
> that the petitioner was on probation from a previous
> crime. Its [sic] apparent the court did not review or
> research this information because if the court would have
> investigated this matter instead of just taking what the
> prosecution said as truth, the court would have seen that
> the petitioner was in fact not on any type of probation
> for any previous crime and had not even been convicted of
> a crime, this false claim made against the petitioner
> caused the petitioner to be given a aggravated charge as
> this was stated in court that the robbery charge would be
> correct as "AGGRAVATED ROBBERY" since the petitioner was
> on probation at the time this matter occurred.

Leavy did not exhaust this claim in state court, and it is barred by procedural default.

Finally, Leavy asserts that he

> was also denied due process of law when the police
> department after questioning the petitioner in the
> presence of the petitioners [sic] family member, they
> then waited until the family member thought the
> questioning was over and left the jail they immediately
> brought the petitioner (juvenile) back out of the cell
> and commenced questioning the juvenile petitioner again
> for hours with no representation of counsel or family
> being present. This is a direct violation of the
> petitioners [sic] right to counsel and in violation of
> the petitioners [sic] right to the 5th amendment of the
> Constitution of the United States and the Constitution of
> the state [sic] of Tennessee.

The petitioner did not exhaust a claim pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), in state court, and the claim is barred by procedural default.[13]

For all the foregoing reasons, the second claim is barred by procedural default and is DISMISSED.

C.   <u>The asserted double jeopardy violation (Claim 3)</u>

In his third claim for relief, Leavy contends that the transfer of the case from juvenile court violates the protection against double jeopardy. In particular, the petition asserts as follows:

> The petitioner was subjected to double jeopardy when the juvenile court held the petitioner in custody with no bond being set, and eventually bound the juvenile over to adult court without holding a proper juvenile hearing where the petitioner could have shown the court that the indictment was improper and the juvenile court enhanced this violation of double jeopardy by dismissing the indictment against the petitioner after bounding [sic] the petitioner over to adult court and then the adult court taking the dismissed indictment and adding aggravating circumstances to this same indictment . . . and charging the petitioner in accordance with that dismissed indictment hence violating the petitioners [sic] right to be free from double jeopardy. Once a indictment is dismissed no other court can make any ruling on that particular indictment. The petitioner was never given any hearing on the indictment that the adult court received from the juvenile court. The indictment heard by the juvenile was dismissed and an indictment that was sent to the adult court was an indictment that the petitioner never received a juvenile court hearing on.

---

[13]     Leavy did exhaust a claim that his attorney rendered ineffective assistance when he withdrew his suppression motion, but that claim is materially different than the claim asserted in this petition. The Tennessee Court of Criminal Appeals rejected that ineffective assistance claim on the merits, <u>Leavy v. State</u>, 2004 WL 42220, at *14-*15, and there is no basis for concluding that Leavy is entitled to relief on that claim under 28 U.S.C. § 2254(d).

Leavy exhausted some aspects of this claim in state court, and the Tennessee Court of Criminal Appeals stated the facts relevant to the transfer from juvenile court:

> The juvenile court entered a detention order on May 1, 1997. On June 3, 1997, the juvenile court conducted the first of two transfer hearings and transferred the juveniles to circuit court on the charges of premeditated first degree murder, felony murder, and aggravated robbery. The juvenile court ordered that both juveniles be held without bond. At a second transfer hearing, conducted July 3, 1997, the juvenile court transferred the juveniles to circuit court on the charge of especially aggravated kidnapping.[14] At the close of the second hearing, the juvenile court again refused to set a bond for defendants. However, at their appearance in circuit court on July 18, 1997, the trial judge set $100,000 bonds for each.

State v. Leavy, 1999 WL 1565193, at *1.

Leavy exhausted a claim that the juvenile court's failure to set bond violated the protection against double jeopardy. The Tennessee Court of Criminal Appeals rejected that claim on the merits:

> In their first issue, defendants claim the trial court erred by failing to dismiss the indictment against them for violation of their double jeopardy and due process rights. Defendants contend the juvenile court was required to set bond upon their transfer to circuit court. See Tenn. R. Juv. P. 24(b)(7). Defendants argue that their pre-trial detention without bond constituted punishment for the charged offenses which rendered

---

[14]     The Tennessee Court of Criminal Appeals stated in a footnote that, "[a]fter hearing the proof on June 3, 1997, the state filed an additional juvenile petition charging defendants with especially aggravated kidnapping, under the incorrect assumption that the Grand Jury could indict defendants only on the offenses for which they were transferred. Although we note the juvenile court judge erred in re-asserting jurisdiction for purposes of the July 3, 1997, transfer hearing, see Tenn. Code Ann. § 37- 1-134(c), any issue in this regard is moot since the Grand Jury indicted, and the defendants were convicted on all charged offenses." State v. Adams, et al., 1999 WL 1565193, at *1 n.2.

subsequent prosecution, conviction, and sentencing a violation of double jeopardy and due process.

Authorities took defendants Adams and Leavy into juvenile custody on April 28, 1997. It appears from the record that the juvenile court held a "detention hearing" soon thereafter. The record is silent as to whether the setting of bond was an issue at the detention hearing, but does reveal that defendants were on juvenile court probation in another county for aggravated burglary at the time of the present offenses.

The juvenile court denied defendants' request for a bond at both transfer hearings. In June, it refused because "the moment that they are transferred it terminates the jurisdiction of the Juvenile Court . . . it is now a Circuit Court matter." In July, it refused "because it is a first degree murder case and extremely heinous in nature."

On July 18, 1997, the circuit court set $100,000 bonds for each defendant.

. . . .

Constitutional provisions against double jeopardy protect an accused from the peril of a second punishment and a second trial for the same offense. Whitwell v. State, 520 S.W.2d 338, 341 (Tenn. 1975); State v. Taylor, 912 S.W.2d 183, 185 (Tenn. Crim. App. 1995); State v. Carter, 890 S.W.2d 449, 452 (Tenn. Crim. App. 1994). However, jeopardy does not attach in a pre-trial proceeding unless defendant is "subject to 'criminal prosecution' and put to trial." State v. Johnson, 980 S.W.2d 414, 420 (Tenn. Crim. App. 1998) (citations omitted); see also State v. Pennington, 952 S.W.2d 420, 422-24 (Tenn. 1997).

Pre-trial detention does not result in the attachment of jeopardy barring prosecution on the charged offenses. Pennington, 952 S.W.2d at 423. If the detention's purpose is remedial rather than punitive, then double jeopardy is not implicated at all. Johnson, 980 S.W.2d at 420 (citations omitted).

We conclude that jeopardy did not attach as a result of the defendants' pre-trial detention. Furthermore, we note that the proper recourse for bond denial was to seek

relief in circuit court. <u>See</u> Tenn. Code Ann. § 40-11-144(b).

In any event, this issue is without merit and does not warrant dismissal of the indictment against defendants.

<u>Id.</u> at *1-*2.

Leavy has, again, failed to refer to the standards for reviewing habeas claims on the merits, <u>see</u> <u>supra</u> pp. 10-15, and to analyze the decision of the Tennessee Court of Criminal Appeals in light of those standards. Leavy has presented no argument that the decision of the Tennessee Court of Criminal Appeals was contrary to, or an unreasonable application of, clearly established federal law, as required by 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented at the state-court hearing, as required by 28 U.S.C. § 2254(d)(2). Accordingly, he has not satisfied his burden of demonstrating that he is entitled to relief on this issue.

Leavy has not exhausted any other double jeopardy claim, including any claim arising out of the failure to afford a hearing on the indictment in juvenile court or the alleged decision by prosecutors to refile the charges in an indictment that had been dismissed. Any such claims are barred by procedural default.

The third issue is without merit and is DISMISSED.

Because it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court," summary dismissal prior to

service on the respondent is proper. Rule 4, Section 2254 Rules.
The petition is DISMISSED.

V.   <u>APPEAL ISSUES</u>

The Court must also determine whether to issue a
certificate of appealability ("COA"). The statute provides:

(1)   Unless a circuit justice or judge issues a
certificate of appealability, an appeal may not be
taken to the court of appeals from—

(A)   the final order in a habeas corpus proceeding
in which the detention complained of arises
out of process issued by a State court; or

(B)   the final order in a proceeding under section
2255.

(2)   A certificate of appealability may issue under
paragraph (1) only if the applicant has made a
substantial showing of the denial of a
constitutional right.

(3)   The certificate of appealability under paragraph
(1) shall indicate which specific issue or issues
satisfy the showing required by paragraph (2).

28 U.S.C. § 2253(c); <u>see also</u> Fed. R. App. P. 22(b); <u>Lyons v. Ohio
Adult Parole Auth.</u>, 105 F.3d 1063, 1073 (6th Cir. 1997) (district
judges may issue certificates of appealability under the AEDPA). No
§ 2254 petitioner may appeal without this certificate.

In <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000), the
Supreme Court stated that § 2253 is a codification of the standard
announced in <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983), which
requires a showing that "reasonable jurists could debate whether
(or, for that matter, agree that) the petition should have been

40

resolved in a different manner or that the issues presented were

"'adequate to deserve encouragement to proceed further.'" <u>Slack</u>,

529 U.S. at 484 (quoting <u>Barefoot</u>, 463 U.S. at 893 & n.4).

   The Supreme Court recently cautioned against undue

limitations on the issuance of certificates of appealability:

> [O]ur opinion in <u>Slack</u> held that a COA does not require
> a showing that the appeal will succeed. Accordingly, a
> court of appeals should not decline the application of a
> COA merely because it believes the applicant will not
> demonstrate an entitlement to relief. The holding in
> <u>Slack</u> would mean very little if appellate review were
> denied because the prisoner did not convince a judge, or,
> for that matter, three judges, that he or she would
> prevail. It is consistent with § 2253 that a COA will
> issue in some instances where there is no certainty of
> ultimate relief. After all, when a COA is sought, the
> whole premise is that the prisoner "'has already failed
> in that endeavor.'"

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 337 (2003) (quoting <u>Barefoot</u>,

463 U.S. at 893). Thus,

> A prisoner seeking a COA must prove "'something more
> than the absence of frivolity'" or the existence of mere
> "good faith" on his or her part. . . . We do not require
> petitioners to prove, before the issuance of a COA, that
> some jurists would grant the petition for habeas corpus.
> Indeed, a claim can be debatable even though every jurist
> of reason might agree, after the COA has been granted and
> the case has received full consideration, that petitioner
> will not prevail.

<u>Id.</u> at 338 (quoting <u>Barefoot</u>, 463 U.S. at 893); <u>see also</u> <u>id.</u> at 342

(cautioning courts against conflating their analysis of the merits

with the decision of whether to issue a COA; "The question is the

debatability of the underlying constitutional claim, not the resolution of that debate.").[15]

In this case, there can be no question that any appeal by this petitioner on any of the issues raised in this petition does not deserve attention for the reasons previously stated. The Court, therefore, DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b), does not apply to appeals of orders denying habeas petitions. Kincade v. Sparkman, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal in forma pauperis in a habeas case, and thereby avoid the $455 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917,[16] the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). Kincade, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal in forma pauperis, the prisoner must file his motion to proceed in forma pauperis in the appellate court. See Fed. R. App. P. 24(a)(4)-(5).

---

[15]   By the same token, the Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue." Id. at 337. Instead, the COA requirement implements a system of "differential treatment of those appeals deserving of attention from those that plainly do not." Id.

[16]   The appellate filing fee increased on $455 effective April 9, 2006.

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter is not taken in good faith, and leave to appeal in forma pauperis is DENIED. Accordingly, if petitioner files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this 1st day of June, 2006.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE